# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| | * | |
| SCOTT LEWIS RENDELMAN | * | |
| | | CRIMINAL NO.  JKB-07-331 |
| v. | * | CIVIL NO. JKB-12-859 |
| | | |
| UNITED STATES OF AMERICA | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM  AND  ORDER

Scott Lewis Rendelman *pro se* has filed a motion (ECF No. 104) under 28 U.S.C. § 2255 to vacate, set aside, or correct the sentence he received after being convicted in this Court of six counts of mailing threatening communications in violation of 18 U.S.C. § 876(c).  (Judgment, Apr. 21, 2008, ECF No. 53.)[1, 2]  The Court has considered it, the Government's response (ECF No. 112), and the record.  The motion will be denied.

## I.  Standard for Motion under 28 U.S.C. § 2255

Four grounds for relief are provided in § 2255:

1)  The sentence was imposed in violation of the Constitution or United States law;

2)  The court was without jurisdiction to impose the sentence;

3)  The sentence was in excess of the maximum authorized by law; or

---

[1]  As originally filed, Rendelman's motion also sought recusal of Judge Titus, the presiding judge at trial and sentencing.  However, the case was reassigned to the undersigned and the motion to recuse was accordingly denied as moot.  (ECF No. 106.)

[2]  Rendelman also filed a motion for a copy of the Government's response.  (ECF No. 113.)  It appears that this motion was mailed from prison the day following the electronic filing of the Government's response, which indicates service by mail on Rendelman at his prison address (ECF No. 112).  Thus, the Court concludes Rendelman's motion crossed in the mail with the Government's response.  Unless advised otherwise, the Court presumes that Rendelman received in due course the Government's response.  It is also noted that the docket does not show the Court's second order extending time for the Government to respond was mailed by the Clerk to Rendelman.  The Government was granted an extension to file its response by September 11, 2012.  (ECF No. 110.)  The Government's response was filed on September 10 and was, therefore, timely.  Consequently, the motion for a copy of the Government's response will be denied as moot.

4) The sentence is otherwise subject to collateral attack.

The Supreme Court has said that, unless a claim alleges either a lack of jurisdiction or a constitutional error, then the scope of collateral attack is far more limited. *United States v. Addonizio*, 442 U.S. 178, 185 (1979), *abrogated on other grounds by rule*. Thus, an error of law cannot be the basis for collateral attack unless the claimed error constituted "'a fundamental defect which inherently results in a complete miscarriage of justice.'" *Id.* at 185 (quoting *Hill v. United States*, 368 U.S. 424, 428 (1962)). Likewise, errors of fact may only serve as the basis for § 2255 relief "'where the errors [are] of the most fundamental character, that is, such as rendered the proceeding itself irregular and invalid.'" *Id.* at 186 (quoting *United States v. Mayer*, 235 U.S. 55, 69 (1914)).

## II.  Asserted Grounds for Relief

Movant has asserted ten grounds for relief. The first four are based on allegedly ineffective assistance of counsel at sentencing. Grounds Five through Ten rest upon allegedly ineffective assistance of counsel on direct appeal. More specifically, Rendelman contends he was denied effective assistance of counsel at sentencing for four reasons:

1. His counsel failed to argue for a downward departure under United States Sentencing Guidelines ("U.S.S.G.") § 5K2.13 (Motion 6);

2. His counsel failed to argue that his criminal history category overstated Rendelman's criminal history (Motion 37);

3. His counsel failed to argue for a downward departure based on the Government's wrongdoing (Motion 38); and

4. His counsel failed to argue for a downward departure based upon his vulnerability to abuse in prison (Motion 46).

On appeal, Rendelman's appellate counsel allegedly provided ineffective assistance for the following reasons in Grounds Five through Ten:

5. Counsel failed to raise the issue of sufficiency of the evidence as to Count 7 (Motion 39), charging Rendelman with mailing a written communication addressed to the U.S. Marshal's Service in Sacramento, California, that contained a threat to injure the President and all White House employees while engaged in the performance of official duties (ECF No. 1);

6. Counsel failed to raise the issue of whether the District Court's four-level upward departure for extreme conduct was improper since the conduct at issue was not done towards any of the named victims in the case but instead was new conduct towards a new victim, involving a new offense for which no finding of guilt had been made (Motion 40);

7. Counsel failed to raise the issue of the District Court's exclusion from Rendelman's opening statement of psychological evaluations showing Rendelman was not dangerous, when those evaluations were seen by two victims before receiving their threatening letters (Motion 40);

8. Counsel failed to raise the issue of the District Court's allowance into evidence, over Rendelman's objection, of letters written after the dates of letters charged in the indictment (Motion 43);

9. Counsel failed to raise the District Court's refusal of Rendelman's tendered jury instructions pertaining to the "reasonable person test" applicable to the recipients of his threatening communications (Motion 44);

10. Counsel failed to raise the issue of jury selection and juror impartiality based on Rendelman's challenges for cause and his unsuccessful requests that the District Court ask his voir dire questions (Motion 44).

### III.  Analysis

Since all of Movant's contentions hinge upon allegations of ineffective assistance of counsel, it is useful to state the standard applied in such cases.  To prevail on this type of claim, Rendelman must show both that his attorney's performance fell below an objective standard of reasonableness and that Rendelman suffered actual prejudice.  *Strickland v. Washington*, 466 U.S. 668, 687-88, 691-92 (1984).   An objective standard of reasonableness is derived from "prevailing professional norms," *id.* at 688, and counsel's performance presumptively falls within the realm of reasonable professional assistance, *id.* at 690.  Performance is judged, but in a "highly deferential" manner, on the facts of the particular case.  *Id.* at 689-90.   Thus, a defendant must show that counsel's acts and omissions were, in light of all of the circumstances, "outside the range of professionally competent assistance."   *Id.* at 690.   To demonstrate prejudice, a defendant must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."  *Id.* at 694.   A court may evaluate either the "performance" prong or the "prejudice" prong first.  *Id.* at 697.   An insufficient showing of either prong ends the inquiry.  *Id.*

####   A.  Sentencing

#####   1.  Downward Departure under U.S.S.G. § 5K2.13

Rendelman represented himself at trial, with his former counsel functioning as standby counsel.  (Dec. 11, 2008, Trial Tr. 3-4, ECF No. 66.)   Following Movant's conviction, his standby counsel once again assumed his role as attorney for Movant and represented Rendelman at sentencing.  (Sent. Tr. 2, ECF No. 60.)   Rendelman has claimed that a psychologist's opinion to the effect that he suffered diminished capacity due to his diagnosis of rape trauma syndrome ("RTS") should have been brought to the sentencing judge's attention as a basis for downward

departure from the sentencing guidelines.  (Motion 6.)  Rendelman avers he was raped in prison in 1986 and that he reacted by writing a threatening letter against an individual who had filed a civil suit against Rendelman in 1984 and a criminal complaint for embezzlement in 1985, thereby causing Rendelman financial problems and stress for him and his family and precipitating his conviction for embezzlement.  Rendelman was denied parole on his Maryland state court sentence and apparently continued writing threatening letters.  After completion of his state sentence, he was transferred to federal custody, tried, and convicted of mailing threatening letters, resulting in a five-year sentence beginning September 1988.  Rendelman alleges he was raped several more times while in federal prison and that the last rape occurred in November 1991.  Rendelman continued to send threatening letters to judges, prosecutors, and prison officials, as well as to Secret Service officers, the President, the U.S. Attorney General, and various state governors.  He was also convicted in 1995 in California state court of mailing a threatening letter to that state's governor and received a three-year sentence.[3]

Rendelman understood that he would stop being convicted and sentenced for mailing threatening letters if he stopped mailing threatening letters, as he wrote in the instant motion:

> Getting released wasn't all that complicated.  All the Movant had to do was stop writing the threatening letters and let his sentence run out.  But to the Movant this presented a problem.  If the Movant stopped writing the letters and suddenly showed conforming behavior it would appear to the casual observer that the government's correctional programming, which included the brutal rapes (and the rapists never being brought to justice), achieved the government's goal of rehabilitating the Movant to a crime free life.  This was something the Movant

---

[3]  According to the sentencing transcript, Rendelman was convicted in 1989 in this Court for mailing threatening communications to a federal judge and was sentenced to 42 months of incarceration and three years of supervised release.  He was also convicted in the Western District of Tennessee in 1990 for mailing threatening letters to various officials including the President and received a 33-month sentence concurrent to the 1989 sentence. He received additional sentences for convictions in the Western District of Texas (in the early to mid-1990s) and the Eastern District of California (in 2000) for mailing threatening letters. After completing those sentences, including supervised release, Rendelman apparently mailed some letters that became the subject of a Maryland state prosecution for extortion and, during the proceedings in that case, he wrote threatening letters to the state prosecutor, a state court judge, and an attorney, as well as the President of the United States and White House employees. Those letters then, in turn, became the basis for prosecution in the instant case.  (ECF No. 60, pp. 9-11.)  His conviction in the extortion case was overturned on appeal.

swore to himself that he would not allow.  The Movant vowed that he would never let the government and the government officials think that subjecting inmates to homosexual rape is the right thing to do in order to get good results. On the contrary, the Movant wanted the government officials to see nothing but bad results from their immoral and illegal treatment in the hopes they would realize such treatment is the <u>wrong</u> thing to do and hopefully do something to change it.  In short, the Movant felt he had to continue writing the letters for as long as he remained incarcerated.  He would stop writing the letters only after he was released, to show the government officials that releasing him had been the right thing to do all along to achieve the good result they were after.  That would be okay, but in practice it became clear to the Movant that what he wanted to do was, in fact, self preclusive.  In order to get out so he could stop writing the letters, the Movant would first have to stop writing the letters while in prison.  But if he stopped writing the letters while in prison, he couldn't show that he stopped writing the letters upon his release because he would have already stopped writing the letters in prison in that case.  The Movant instead would have to keep writing the letters until his release, but in that case as long as the Movant kept writing the letters, he would continue to get new charges and he would <u>never</u> get released. The Movant was therefore stuck in a loop:  the letters kept him locked up, and his incarceration required that he keep writing the letters.   In short, the Movant realized he would probably stay locked up the rest of his life unless there was some miracle to release him.

Little did the Movant know that the "miracle" he needed had been there all along, just waiting to happen.  The Movant was suffering from Rape Trauma Syndrome ("RTS") which is a species of Post Traumatic Stress Disorder.

(Motion 9.)

Rendelman claims that his RTS condition leaves him in a diminished capacity state such that he is unable to control his behavior even though he knows his behavior is wrongful.  Thus, he asserts he qualifies for the leniency of sentencing provided in U.S.S.G. § 5K2.13, and his counsel at sentencing was ineffective for failing to argue that point.

Section 5K2.13 provides as follows:

**<u>Diminished Capacity</u> (Policy Statement)**

A downward departure may be warranted if (1) the defendant committed the offense while suffering from a significantly reduced mental capacity; and (2) the significantly reduced mental capacity contributed substantially to the commission of the offense.  Similarly, if a departure is warranted under this policy state, the extent of the departure should reflect the extent to which the reduced mental capacity contributed to the commission of the offense.

6

However, the court may not depart below the applicable guideline range if (1) the significantly reduced mental capacity was caused by the voluntary use of drugs or other intoxicants; (2) the facts and circumstances of the defendant's offense indicate a need to protect the public because the offense involved actual violence or a serious threat of violence; (3) the defendant's criminal history indicates a need to incarcerate the defendant to protect the public; or (4) the defendant has been convicted of an offense under chapter 71, 109A, 110, or 117, of title 18, United States Code.

In the Application Note following § 5K2.13, the following comment is made:

For purposes of this policy statement—

"Significantly reduced mental capacity" means the defendant, although convicted, has a significantly impaired ability to (A) understand the wrongfulness of the behavior comprising the offense or to exercise the power of reason; or (B) control behavior that the defendant knows is wrongful.

By its terms, Section 5K2.13 excludes from consideration for lenity an offense involving a serious threat of violence, and Rendelman's offense involved a serious threat of violence. Counsel's election not to argue for downward departure under § 5K2.13 was a reasonable tactical decision. Because Rendelman did not qualify for this downward departure, he suffered no prejudice when his counsel did not argue in favor of it. His first ground for relief is without merit.

### 2.    *Overstatement of Criminal History*

Rendelman contends that Judge Titus should have, as had the judge in the 2001 California conviction, concluded that all of his threatening letters over the years constituted a single course of conduct, thereby allowing for a three-level reduction in his criminal history category from Category VI to Category III. Movant says that the sentencing guidelines have changed since 2001, so that under the current guidelines, a reduction in criminal history category based on this kind of argument would only be downward one level, not three as in 2001.

Rendelman's criminal history category was calculated in the presentence report to be at the highest level, a Category VI, and Judge Titus noted at sentencing that he qualified as a career criminal.  (Sent. Tr. 9, ECF No. 60.)   The parties offered no disagreement about the criminal history category.   Judge Titus then reviewed Movant's criminal history and observed, "[T]he criminal history here is a sad and extensive one that dates back to his original conviction in the Circuit Court for Montgomery County in the mid-eighties . . . ."   Judge Titus noted Rendelman's numerous convictions for mailing threatening letters in the years leading up to his 2008 conviction for the same conduct.

It was a reasonable tactical decision by counsel not to argue that Movant's threatening communications over roughly twenty years were a single course of continuing conduct since the communications were sent from various locations at various times to various recipients.  Counsel could reasonably decide this line of argument would not be fruitful since there were apparently sufficient predicate offenses to qualify movant for career-offender status.  *See also United States v. Spring*, No. 03-4902, 108 F. App'x 116, 122-23 (4th Cir. 2004) (unpublished) (per curiam) (downward departure for overstatement of criminal history improper where inconsistent with structure and theory of career offender guideline, which specifically includes threatened use of physical force in defining  term "crime of violence").  This second argument is without merit.

### 3.   *Government's Wrongdoing*

Movant   asserts   the   Government   intentionally   placed   him   "in   rape   situations"; consequently, the Government caused his RTS and "provok[ed] Movant with wrongful, if not illegal, incarceration."   Thus, the Government caused Rendelman to commit his offenses. (Motion 38.)  Rendelman has stated that the last incident of prison rape by inmates occurred in 1991, a time too attenuated from the 2008 conviction to make that and even earlier incidents a

causative factor for his criminal conduct in the instant case.  Counsel made a reasonable strategic choice not to argue for a downward departure on this basis.  This argument is without merit.

### 4.   *Vulnerability to Abuse in Prison*

Movant alleges he was raped in prison five times and beaten by cellmates twice.  Thus, he argues, he should have been considered by Judge Titus as vulnerable to abuse in prison, justifying a downward departure, and that his counsel was ineffective for not arguing this.  In 2008 when Rendelman was sentenced, U.S.S.G. § 5H1.4 provided in pertinent part, "Physical condition or appearance, including physique, is not ordinarily relevant in determining whether a departure may be warranted.  However, an extraordinary physical impairment may be a reason to depart downward . . . ."   In 2010, § 5H1.4 was revised to read, "Physical condition or appearance, including physique, may be relevant in determining whether a departure is warranted, if the condition or appearance, individually or in combination with other offender characteristics, is present to an unusual degree and distinguishes the case from the typical cases covered by the guidelines. An extraordinary physical impairment may be a reason to depart downward . . . ."   In *Spring*, the Fourth Circuit affirmed the district court's downward departure on the basis that Spring would be extremely vulnerable to abuse in prison, taking into account the defendant's height (5′6″), weight (90 pounds), and immature appearance.  108 F. App'x at 124-25.

In reviewing the sentencing transcript, the Court finds no evidence that "distinguishes th[is] case from the typical cases covered by the guidelines," if one were to apply the more lenient 2010 guidelines.  Taking his allegations at his word, Rendelman has been subjected to unacceptable prison abuse, but it is not clear that he is extremely vulnerable to such abuse. Although both Rendelman and his attorney made lengthy addresses during the sentencing proceeding, and although Rendelman included the fact of his abuse in his allocution, neither he

nor counsel asked for a downward departure on this basis, dwelling instead on their requests for probation instead of incarceration.  Rendelman does not say that he asked his lawyer to make the argument he now presses.  That Rendelman's counsel did not make this argument is not proof that his assistance fell outside of prevailing professional norms.  This ground for relief is without merit.

### B.  Appeal

#### 1.  Sufficiency of the Evidence as to Count 7

Rendelman next claims that his appellate counsel failed to raise the sufficiency of the evidence as to Count 7 on appeal.  (Motion 39.)  This issue was in fact raised on appeal and addressed by the Fourth Circuit.  On direct appeal, Rendelman's challenge was to the sufficiency of the evidence to support the jury's affirmative answer to a special interrogatory, *i.e.*, "the jury's finding that the threatening communication 'was addressed to the President and all White House employees while those officers or employees were engaged in the performance of official duties,'" within the meaning of 18 U.S.C. § 876(c).  *United States v. Rendelman*, 641 F.3d 36, 48 (4th Cir. 2011).  The special interrogatory as submitted to the jury read, "Do you find that the president and all White House employees were, at the time of the charged offense, federal officers or employees engaged in the performance of their official duties?"  (Dec. 14, 2008, Trial Tr. 73, ECF No. 68.)  Although Rendelman's appellate argument was focused on the meaning of the words "addressed to," and Rendelman now seeks to focus on the words "while [they] were engaged in . . . official duties," the Fourth Circuit's opinion nevertheless implicitly evaluated the sufficiency of the evidence in all respects as to Count 7:

> In the light most favorable to the prosecution, Rendelman addressed and mailed the 2006 Letter to the Marshals Service in California, and threatened to kill the President and White House employees. The threat to injure in the 2006 Letter was, as the jury found, addressed to (i.e., directed to) the President and White House employees while engaged in the performance of official duties.

641 F.3d at 49 n.14.  His argument now has no merit.

### 2. *Four-level Upward Departure for Extreme Conduct*

Before the sentencing proceeding, Judge Titus issued a memorandum to counsel advising

them he

> was contemplating a possible departure or variance based upon, among other
> factors, the apparent authorship by the defendant of a letter to Judge Motz of this
> court dated January 8, 2008, after the date of [Rendelman's] conviction, which
> [Judge Titus] attached to the memo, the existence of aggravating circumstances
> under Section 5K2.0(a)(1)(A), disruption of a governmental function under
> Section 5K2.7 and, finally, extreme conduct under sentencing guideline 5K2.8.

(Sent. Tr. 3, ECF No. 60.)

Movant did not dispute that he authored the letter to Judge Motz.  (*Id.* 4-5.)  But he now

argues the four-level upward departure, which Judge Titus did impose, was improper because

Judge Motz was not one of the victims in his case and Rendelman had not been convicted

regarding that letter.  (Motion 40.)  However, the letter to Judge Motz was only one of four bases

considered by Judge Titus in deciding on the upward departure, and he later said that his focus as

to an upward departure or a variance was on extreme conduct under § 5K2.8.  (Sent. Tr. 11.)

The "extreme conduct" to which Judge Titus was referring was that for which Rendelman was

convicted; the letter to Judge Motz was not the deciding factor, although Judge Titus took it into

account.  (Sent. Tr. 50.)  Further, Judge Titus emphasized that, if he had erred in the application

of the upward departure, he would find that the range of sentence under the guidelines was

inadequate and that he "would adopt a variance sentence because of the need to more accurately

emulate the [18 U.S.C. §] 3553 factors."  (Sent. Tr. 26.)  Thus, Rendelman cannot establish

prejudice since he would have received the same sentence regardless of the upward departure.

This contention is without merit.

### 3.  *Exclusion from Opening Statement of Mention of Psychological Evaluations*

Representing himself at trial, Rendelman made his opening statement to the jury.  During his statement, the following transpired:

> In December of 2001 I was facing sentencing for yet another indictment. The evidence will show I was supposed to get another five years, but the judge in that case, for reasons which I think will be obvious, decided that he should let me out. I had been locked up for 15 years.  There were psychological evaluations that were before him saying --
>
> MS. BELF: Objection.
>
> MR. RENDELMAN: -- I was not dangerous.
>
> MS. BELF: May we approach?
>
> THE COURT: Yes, you may.
>
>              (At the bar of the Court.)
>
> MS. BELF: It's not going to be in evidence his mental state.
>
> THE COURT: I can't hear you.
>
> MS. BELF: His mental state is not going to be in evidence whatsoever, and interjecting that into this trial, we believe, does nothing but confuse the jury. He has not given any notice of, nor does he intend to raise, any insanity defense.
>
> THE COURT: Do you intend to call any psychiatric testimony?
>
> MR. RENDELMAN: I don't intend to call any psychiatric testimony.  I myself was going to introduce the reports to show what the recipients saw or knew at the time they received the letters.
>
> THE COURT: I don't know what report you're talking about.
>
> MR. RENDELMAN: Psychological evaluations that were seen by Judge Dugan, by Carol Crawford –
>
> THE COURT: At this time I can't make a ruling on those issues.  A circumstance like this is not appropriate for your opening statement.  Move on to another subject, and we will see whether this can be admitted or not.  It sounds doubtful to me, and you can't fill up your opening statement with information that is not appropriate.  I'll have you continue with your opening statement, and we'll deal with this in the evidentiary -- when we get into the evidentiary phase.

MR. RENDELMAN: Okay.

(Dec. 11, 2008, Trial Tr. 59-60, ECF No. 77.)

Although Movant says that Judge Titus eliminated the evaluations completely from the trial (Motion 41), the trial transcript contradicts that statement.  He only deferred ruling on admissibility subject to any later effort by Rendelman to introduce the reports.  Rendelman does not indicate he later offered the reports for admission into evidence.  Thus, it cannot be said that Judge Titus excluded them from trial.  Appellate counsel reasonably forewent this argument. The seventh ground for relief is without merit.

### 4.   *Admission of Post-indictment Letters*

Movant next contends that his appellate counsel rendered ineffective assistance because he failed to argue that the trial court committed reversible error by admitting into evidence, over his objection, letters written after the dates of the letters charged in the indictment.  (Motion 43.) The Court presumes the letters in question were authored by Rendelman and were of the same threatening nature as the ones in the case.  He has not offered a citation to the trial transcript to assist in the Court's analysis of this contention, but from what he has stated in his motion, it seems likely that these letters could have been admitted under Rule 404(b), Federal Rules of Evidence, to show intent, identity, absence of mistake, etc.  The language of Rule 404(b) is not limited to similar evidence in existence before indictment; the Rule may be equally employed to admit similar evidence coming into existence after indictment.  Appellate counsel could have reasonably decided not to argue this on appeal because of its lack of merit.

### 5.   *Tendered and Refused Jury Instructions*

Movant argues he received ineffective assistance of appellate counsel because he did not raise the issue of the trial court's refusal of Rendelman's tendered jury instructions pertaining to

the "reasonable person test" applicable to the recipients of his threatened communications.

(Motion 44.)  Rendelman submitted the following proposed additional jury instruction:

Jury Instruction No. 41
(Context of Threat)

     To determine whether or not a reasonable person would understand the threat as a serious expression of intent to inflict injury, you should consider the context in which the threat was made.

     As used here, the word "context" is not limited to the language used within the 4 corners of the letter, but rather calls for you to put yourself in the place of the recipient and consider the threat in light of all facts known to the recipient at the time of the threat.  You may consider, for example, what the recipient knew about the Defendant, his history, his reasons for making the threat, and any other letters received from the Defendant.

Clarification to Jury Instruction No. 32.  See also Roy v. U.S.

(ECF No. 31, p. 1.)

Rendelman had submitted this and other proposed additional instructions *pro se* after his

motion to dismiss his counsel and proceed *pro se* was granted at his motions hearing.  (ECF

No. 25; docket entries 12/3/07.)  Previous to that, his counsel had agreed to a joint submission of

jury instructions with the Government, in which Proposed Jury Instruction Number 32 read as

follows:

JURY INSTRUCTION No. 32
(Counts Two through Seven – First Element – Threat)

     The first element the government must establish beyond a reasonable doubt is that the defendant threatened to kidnap or to injure the named victims as charged in the indictment.

     A threat is a serious statement expressing an intention to inflict injury (or kidnap) at once or in the future, as distinguished from idle or careless talk, exaggeration, or something said in a joking manner.  A statement is a threat if it was made under such circumstances that a reasonable person hearing or reading the statement would understand it as a serious expression of intent to inflict injury (or a reasonable person making the statement would foresee that the recipient would understand it as a serious expression of intent to inflict injury).

     To determine whether or not the defendant made a threat, you should consider the circumstances under which the statement was made, including its

14

context with respect to surrounding conversation, the language the defendant used, and the reaction of those who heard or read the statement.

It is not necessary that the government prove that the defendant intended to carry out the threat or that he had the present ability to carry out the threat. A threat [m]ay be conditional upon the defendant's ability to carry it out.

Sand, Modern Federal Jury Instructions, 31-13

(ECF No. 24.)

Prior to the charge conference, Judge Titus had provided the parties with his proposed instructions including Number 32, which was left unchanged, save for correction of a typographical error. (ECF No. 38.) At the charge conference, Judge Titus had extensive dialogue with both Movant and the prosecutor about Number 32, but Rendelman never asked for the specific language he had included in his earlier filing. The conversation at the charge conference was directed to the prosecutor's anticipation that Rendelman would argue to the jury that his communication could not be considered a threat because it was a protest of his allegedly wrongful incarceration. Consequently, she requested language to the effect that the statute prohibiting the mailing of threatening communications did not include a "protest exception." After extensive discussion back and forth, everyone agreed that, with the exception of some editorial changes to delete unnecessary language, the instruction would be fine without any additional language. (Dec. 13, 2008, Trial Tr. 22-37, ECF No. 99.)[4] Thus, Rendelman waived

---

[4] As given, the trial judge's charge to the jury on the "threat" element was as follows:

The first element, as I mentioned, is that the defendant threatened to kidnap or to injure the named victims as charged in the indictment. A threat is a serious statement expressing an intent to inflict injury at once or in the future, as distinguished from idle or careless talk, exaggeration, or something said in a joking manner.

A statement is a threat if it was made under such circumstances that a reasonable person hearing or reading the statement would understand it as a serious expression of intent to inflict injury.

To determine whether or not the defendant made a threat, you should consider the circumstances under which the statement was made, including its context with respect to surrounding conversation, the language the defendant used, and the reaction of those who heard or read the statement. It is not necessary that the government prove that the defendant intended to carry out the threat, or that he had the present ability to carry out the threat.

(Dec. 13, 2008, Trial Tr. 24-25, ECF No. 98.)

any appellate objection to the omission of his instruction.  His counsel on direct appeal could reasonably conclude such an argument would not succeed.

### 6.    *Voir Dire*

Rendelman's last argument is that his appellate counsel was ineffective for failing to challenge the jury selection process—specifically, the challenges for cause by Rendelman and some requested voir dire questions regarding his offensive language and inflammatory views, as expressed in his letters, about religion, homosexuality, government, and government employees. Movant challenged for cause Venire Number 289, a sister of a convicted murderer (Dec. 11, 2008, Trial Tr. 50, ECF No. 92); Venire Number 294, a busy accountant (*id.* 56); Venire Number 2, an elementary Spanish teacher scheduled to present a school program the day after voir dire (*id.* 79); Venire Number 51, an employee of the International Monetary Fund who was aware that the IMF had received letters with terrorist threats (*id.* 100-04); Venire Number 122, a man with several medical issues (*id.* 135-40); and Venire Number 143, a retired government engineer who lost several colleagues in the September 11, 2001, terrorist attack on the Pentagon (*id.* 154-58).

Out of those six individuals, only one, Venire Number 143, was picked for the jury panel. (Dec. 11, 2008, Trial Tr. 32, ECF No. 66.)  (Numbers 294, 2, and 122 were excused for hardship reasons.  (Dec. 11, 2008, Trial Tr. 167-70, ECF No. 92.))  However, Number 143 was the thirteenth person picked for the jury panel and would have been the first alternate juror, if the jurors were seated in the order in which the courtroom deputy called their numbers.  No alternate jurors wound up serving on the jury panel that deliberated and reached a verdict.  Thus, it is reasonable to conclude that this person had no effect on the verdict.  Even if he had been a member of the jury that determined Movant's guilt, the trial judge questioned him at voir dire as to whether he could be fair and impartial if chosen as a juror in the case, and he responded

affirmatively, indicating he felt duty bound as both a military officer and a federal employee to defend the Constitution, and he believed he could be impartial.  (Dec. 11, 2008, Trial Tr. 156-57, ECF No. 92.)  It was not an abuse of discretion for the trial judge to deny Rendelman's challenge for cause to this juror, and appellate counsel may have reasonably decided it was not an issue worth pursuing on direct appeal.

As for the requested voir dire questions, the Court concludes the voir dire as given appropriately covered all requested bases.  Rendelman's first requested voir dire question was directed to his *pro se* status and asked whether jurors would not be impartial because he was representing himself.  (ECF No. 30.)  At the beginning of voir dire, Judge Titus instructed those present that a defendant has a right to be represented by an attorney and the right to waive the right of attorney representation and to represent himself.  (Dec. 11, 2008, Trial Tr. 14, ECF No. 92.)   He further instructed them:

> The defendant in this case has chosen to represent himself, and he has, however, had a standby counsel appointed for him. You should not infer anything adverse to the defendant in this case as a result of his decision to represent himself.  He should be treated like any other litigant before this court.

(*Id.*)  Later, the judge asked the following question:  "The defendant in this case is representing himself, as I previously advised you. Does any person here have any difficulty in following an instruction from me that you should infer nothing adverse to the defendant as a result of his decision to represent himself?"  (*Id.* 41.)  Requested voir dire question number 1 was adequately addressed in voir dire.

The second requested voir dire question sought opinions from potential jurors about Rendelman's appearance.  (ECF No. 30.)  At an earlier proceeding, Rendelman had appeared with "very long hair and a beard," but at voir dire, Judge Titus noted that Rendelman "has a nice haircut and has been shaved"; thus, this second question was unnecessary.  (Dec. 11, 2008, Trial

Tr. 27, ECF No. 66.)  Movant did not disagree with the judge's assessment.  No error occurred because the second question was not asked.

The third through ninth requested voir dire questions focused on material expected to be introduced at the trial that could be regarded as "anti-American and anti-government," offensive to homosexuals, "anti-religious and blasphemous," "bloody, gorey [*sic*], and extremely offensive to the dignity of the human body, including graphic descriptions of dismemberment and mutilation of dead bodies," "graphically sexual, including perverted sex acts and sex acts with dead bodies," "gratuitous foul language, 'four letter words,' and extremely rude and offensive remarks, many of which are sexual in nature," and "extremely derogatory towards law enforcement officers, correctional officers, police, the President, and other public officials." (ECF No. 30.)  Judge Titus said all of those questions would be adequately covered in his instruction number 24, probably meaning voir dire question number 24.  (Dec. 11, 2008, Trial Tr. 27, ECF No. 66.)  During voir dire, the judge posed the following question:

> Some of the mailed letters about which you will hear in this case may contain harsh or graphic language and include some sexual content in references to acts of violence and terrorist acts against the government.  Knowing that, do any of you have concerns about your ability to judge the evidence fairly and impartially?

(Dec. 11, 2008, Trial Tr. 40, ECF No. 92.)  As Judge Titus noted, his voir dire question, as posed to the venire members, gave them enough information for them to decide whether they could be fair jurors.  (Dec. 11, 2008, Trial Tr. 27-28, ECF No. 66.)  No error occurred when the judge did not pose the specific questions requested by Rendelman on this point.

Movant's tenth and eleventh requested voir dire questions were designed to find out if potential jurors or someone close to them had ever received a threatening communication.  (ECF No. 30.)  This was covered in voir dire when Judge Titus asked, "Have you, any member of your family or any of your close friends ever been the victim of a crime, including the receipt of

threatening communications, including letters and phone calls?"  (Dec. 11, 2008, Trial Tr. 43, ECF No. 92.)  No error occurred in this respect.

Movant's last requested voir dire question was focused on the support of terrorism and terrorist acts.  (ECF No. 30.)  This was adequately covered by the voir dire question about the language and content of the mailed letters (*id.* 40), which was specifically modified to incorporate the mention of "terrorist acts against the government" (Dec. 11, 2008, Trial Tr. 28-31, ECF No. 66.)

The trial judge addressed all pertinent bases in voir dire, and appellate counsel may have reasonably decided that raising any issue about voir dire on direct appeal would be unproductive.

## IV. Conclusion

Movant has not satisfied the "performance and prejudice" inquiry under *Strickland v. Washington* for any of his assignments of error.  His motion pursuant to 28 U.S.C. § 2255 (ECF No. 104) is hereby DENIED.  The motion for a copy of the Government's response (ECF No. 113) is DENIED AS MOOT.

DATED this  9th  day of January, 2013.

BY THE COURT:


_____/s/_____
James K. Bredar
United States District Judge